Paulette ROSS et al., Plaintiffs,

v.

Donald W. SALTMARSH et al., Defendants.

No. 74 Civ. 5047 (MJL).

United States District Court, S. D. New York.

May 14, 1980.

See also D.C., 500 F.Supp. 928.

Children's Defense Fund, Washington, D. C., Mid-Hudson Valley Legal Services, Inc., Newburgh, N. Y., for plaintiffs.

McCue & McCue, Newburgh, N. Y., Demov, Morris, Levin & Shein, New York City, for defendants.

## MEMORANDUM OPINION AND ORDER

LOWE, District Judge.

The parties to this civil rights class action apply for approval of a proposed settlement under Rule 23(e) of the Federal Rules of Civil Procedure ("F.R.C.P.").[1]

### I. *Facts*

Plaintiffs commenced this action on November 14, 1974 as a class action, pursuant to F.R.C.P. 23(a) and 23(b)(2), on behalf of all minority students in the School District of Newburgh, New York.

The members of the class are all minority students attending schools in the Newburgh School District and their parents. Defendants are the Board of Education of the City District of Newburgh, the Board's members, the Superintendent of Schools, the principal and vice-principal of North Junior High School of the City District of Newburgh.[2] All of the defendants are sued in their official capacity.

The Complaint alleges, *inter alia*, that certain policies and practices of the School District violate the constitutional rights of plaintiffs. The principal allegations are: (1) the School District violated the First and Fourteenth Amendment rights of plaintiffs by "subjecting and/or threatening to subject" them to suspension or expulsion from school for criticizing the policies of the Newburgh school system. Plaintiffs allege that these threats have had and continue to have a "chilling effect" upon the exercise of their First Amendment rights; (2) the School District imposes discipline on a racially discriminatory basis in violation of the due process and equal protection clauses of the Fourteenth Amendment; (3) the School District employs procedures in suspension hearings which violate the due process clause of the Fourteenth Amendment and § 3214 of the New York Education Law; (4) the School District fails to provide equal educational opportunities to plaintiffs in violation of the Equal Educational Opportunities Act of 1974, 20 U.S.C. § 1701 *et seq.*; (5) the School District, by its acts and omissions, has violated rights guaranteed plaintiffs by Section 601 of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000d.[3]

The Complaint seeks: (1) a declaration that the alleged acts of the School District are illegal and unconstitutional; (2) preliminary and permanent injunctive relief restraining the School District from engaging in such action; (3) preliminary and permanent injunctive relief requiring the defendants (a) to expunge all records of disciplinary action taken by the School District against plaintiffs, and (b) to submit an affirmative action plan detailing policies and procedures which will be implemented to eliminate the alleged discriminatory conduct; (4) an award of attorney's fees and costs.

The defendants, in their Answer, deny the material allegations in the Complaint, and allege the following as affirmative de-

---

1. F.R.C.P. 23(e) provides,

 "*Dismissal or Compromise.* A class action shall not be dismissed or compromised without the approval of the court, and notice of the proposed dismissal or compromise shall be given to all members of the class in such manner as the court directs."

2. Defendants are hereinafter referred to as "the School District".

3. Section 601 of the Civil Rights Act of 1964 provides,

 "No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."

fenses: (1) the Complaint fails to state a claim upon which relief can be granted; (2) the individual members of the School Board of the Newburgh School District are immune from liability; (3) certain named plaintiffs are barred from proceeding as party plaintiffs; (4) plaintiffs' claim pursuant to Section 601 of the Civil Rights Act is barred (a) by the Statute of Limitations, (b) because plaintiffs have failed to exhaust their administrative remedies, (c) because plaintiffs lack standing; (5) plaintiffs' claim pursuant to the Equal Educational Opportunities Act is barred by plaintiffs failure to exhaust their administrative remedies; (6) plaintiffs' claim pursuant to § 3214 of the New York Education Law is barred by plaintiffs failure to exhaust their administrative remedies; (7) the Court lacks subject matter jurisdiction insofar as jurisdiction is predicated on 28 U.S.C. § 1331 and § 1343(4), Section 601 of the Civil Rights Act of 1964, or Section 207 of the Equal Educational Opportunities Act; (8) plaintiffs have failed to join the New York State Commissioner of Education, allegedly an indispensable party to this action; (9) the Court ought not to assume jurisdiction over plaintiffs' pendent state claim because plaintiffs have failed to exhaust their administrative remedies.

This Court has jurisdiction pursuant to 28 U.S.C. § 1331, § 1343(3) and (4), § 209 of the Equal Educational Opportunities Act of 1974, and on principles of pendent jurisdiction. Plaintiffs action for declaratory and injunctive relief is authorized by 28 U.S.C. § 2201, § 2202 and F.R.C.P. 57.

In an opinion dated March 19, 1976, this Court (Cannella, J.), after finding that this action met the requirements of F.R.C.P. 23(a) and 23(b)(2), ordered that this action be maintained as a class action pursuant to F.R.C.P. 23(b)(2) on behalf of all minority students attending schools in the Newburgh School District.

Pursuant to the proposed Consent Decree, notice of the proposed settlement was distributed to each class member in Newburgh Free Academy, North and South Junior High Schools, Newburgh, New York on No-

vember 1 and 2, 1979. In addition, notice of the proposed settlement was published in *The Evening News*, a daily newspaper published by the Newburgh-Beacon News Co., Inc. and of general circulation in Orange and Dutchess Counties, New York, on October 31, November 1 and 2, 1979. The notice outlined the terms of the settlement, gave notice that a hearing on these matters would be held November 19, 1979, and informed class members of their right to object to the settlement. Since there were no written objections to the proposed settlement received by the Court, the hearing scheduled for November 19, 1979, was adjourned with the knowledge and consent of both sides' attorneys.

## II. *The Settlement*

The settlement was negotiated by counsel on both sides with the guidance and approval of their respective clients. Plaintiffs and the School District have agreed to the entry of the proposed Consent Decree which settles all claims against the School District except for the claim of attorney's fees. Agreement to the entry of the proposed Consent Decree does not constitute an admission by any party as to any issue of fact or law regarding discrimination by and/or liability of the School District, nor does it constitute a waiver of plaintiff's claim for attorney's fees against the School District, nor any defenses the School District may have against that claim. Under the agreement, the terms and conditions of the Decree are binding upon each of the defendant officials, their agents, employees and representatives, and upon their successors in office without the necessity for formal substitution.

The terms of the proposed Consent Decree provide:

1. This Court has jurisdiction over the subject matter of all of plaintiffs' claims against the School District and jurisdiction over the persons of the defendants with respect to these claims.

2. Pursuant to Rule 23(c)(3) of the Federal Rules of Civil Procedure, the class to which this decree applies is defined as: all minority students attending schools in the Newburgh City School District.

3. For the purposes of this Decree, the following definitions shall apply unless a contrary meaning is indicated in the text:

(a) "suspension" shall mean exclusion from school and/or regular classroom attendance including participation in in-school suspension programs such as Project Rescue;

(b) "minority" shall mean a member of the black and/or Hispanic race;

(c) "suspension rate" shall mean the ratio of the number of students suspended at least once to the number of students in the relevant school population;

(d) "disparities" shall mean difference; the mention of the word disparities in no way constitutes an admission by the defendants that such disparities exist.

(e) "entry of this Decree" shall mean the signing of this Decree by the Court."

## I. CONSULTANTS

### A. Selection and Contract

4. The District shall contract with an individual or group, hereinafter the "consultant" which shall assist in meeting the goals and carrying out the provisions of this Consent Decree.

5. The plaintiffs shall nominate candidates to act as consultants. Such candidates shall have as minimum qualifications a Bachelor's Degree and a background in both education and human relations. No candidate may reside within the district. The School District shall select one of the nominees unless they can show good cause for rejection of all plaintiffs' nominees. In such case, plaintiffs shall make additional nominations. The School District shall have the option to contract with the consultant on a full time or part time basis. The terms of the contract shall be in accord with the provisions of this Decree and shall be approved by both parties. The terms of the contract with the consultant shall be until June 30, 1981 unless the "Goals" set forth in paragraph 30 are met sooner. In the event the time table, set forth in paragraph 30, is not met and a new timetable is set, the term shall be extended in accordance with the new timetable.

5a. The School District shall have the right to recommend candidates to the plaintiff for the position of consultant.

6. The consultant shall be selected and the contract approved by both parties within 45 days of the entry of this Decree.

7. If the School District or the plaintiffs find that the consultant is not complying with the terms of this Decree, the parties shall meet to resolve the situation and may choose another consultant.

### B. Function

8. The consultant shall advise the defendants of and develop written plans for all steps necessary to the elimination of the racial disparities in suspension rates at Newburgh Free Academy, North Junior High School and South Junior High School.

9. The consultant shall meet with students, parents, teachers, administrators, Board of Education members, and attorneys for both parties in order to assess what is necessary for the elimination of the racial disparities in suspension rates. The consultant shall continue to consult with the above-named individuals during the course of the contract.

10. The consultant shall work with each building committee, established pursuant to this Decree, to identify policies and practices which account for disparities in suspension rates for minority students.

11. The consultant shall develop proposals for the elimination of the racial disparities in suspension rates and shall:

a. present those proposals in writing to the building committees established by this Decree;

b. work with the committee to insure the proposals meet the needs of the respective schools;

c. modify the proposals if appropriate in view of the advice of the committee;

d. present the proposals in writing to the Superintendent of the School District for approval.

12. If the Superintendent rejects or modifies the proposal, or fails to act on it

within 7 days of submission to him, the consultant and/or building committees may present the proposal to the Board of Education for its approval or rejection.

13. The consultant's written proposals for the elimination of the racial disparities in suspension rates shall include but not be limited to:

a. Modifications of the "Right to Learn", the School District's student behavior code, including the simplification and clarification of its provisions to make it more easily understood by students and parents and the reduction of the use of suspensions and other methods of discipline which remove students from the classroom;

b. Design of in-school alternatives to suspension including modifications in Project Rescue;

c. Involvement of students in peer discipline such as through a student team system and/or student monitors;

d. Greater involvement of guidance counselors in the discipline process;

e. Greater involvement of parents and student advocates in the discipline process;

f. Assistance to teachers for classes with large numbers of discipline referrals;

g. Tutoring arrangements for students with achievement related behavior problems;

h. Referral of students to psychological services;

i. Encouragement and facilitation of interracial participation in all student extracurricular activities;

j. The possibility of alternatives to methods of academic grouping that lead to classrooms with racially homogenous student populations or classrooms with predominant minority populations.

14. At the time performance of the contract begins and thereafter the School District shall supply the consultant with all statistical and other information available to it which deals with discipline, including:

(a) all written policies presently in effect;

(b) access to all student guidance files; as allowed by the Court in its order of September 7, 1977 and this Decree;

(c) current summaries of suspensions and those which have been prepared in the past five years by the Superintendent's Office;

(d) current suspension logs and those which have been prepared in the past five years by principals of the schools;

(e) any other information necessary to the function of the consultant.

15. Plaintiffs, through their attorneys, shall furnish to the consultant all statistical information they have compiled in the course of discovery in this action.

16. At the conclusion of each school semester the school district shall furnish to the consultant:

a. a suspension log showing for each suspension by a principal or the Superintendent: name of the student, race, grade, referring teacher, offense, date of suspension, suspending official, date of return to school and length of suspension;

b. for each referral to Project Rescue or other in-school suspension programs: the name of the student, race, grade, referring teacher, reason for referral, school.

c. for each teacher the number of disciplinary referrals of students to an administrator by race of the referred students.

17. The consultant shall arrange for the School District to contract for training in race relations and in strategies for handling discipline problems for all teachers and administrators. He/she shall arrange for such training by a group and on terms mutually agreeable to the School District and plaintiffs. Such training shall commence within 45 days of the signing of the contract between the School District and the consultant.

18. The consultant shall arrange for the School District to contract for the training of parents and students who participate on the building committees in order to enable them to participate effectively. He/she shall choose a group to do the training subject to the approval of the Board of

Education. Such training shall commence within 45 days of the signing of the contract between the School District and the consultant.

19. The consultant shall prepare written reports at the end of each school semester for both the School District and the plaintiffs on the progress in meeting the goals set forth in this Decree. Such reports shall include the following:

 a. the suspension logs prepared by the building principals, the other information furnished for that semester as set forth in paragraph 14 above;

 b. the steps taken thus far to eliminate the racial disparities in suspension rates;

 c. the immediate steps that need to be taken;

 d. copies of all proposals presented during that semester to the building committees, the Superintendent, and/or the Board;

 e. all policies adopted by the Board and/or the Superintendent during the semester.

## II. *COMMITTEES*

### A. Formation

20. A committee on discipline shall be established for each building: Newburgh Free Academy (NFA), North Junior High School (NJH) and South Junior High School (SJH).

21. Each Building Committee shall be composed of: one (1) teacher, four (4) students, four (4) parents of students within the particular building, one (1) community representative, and the principal of the building. Three (3) students, three (3) parents and the community representative shall be chosen by the plaintiffs. One (1) student, one (1) parent and one (1) teacher shall be chosen by the School District. A representative of the superintendent may attend the meetings as a non-voting participant.

22. The committee shall be convened within 20 days of the entry of this Decree by the principal of the building.

23. At its first meeting each committee shall elect a chairperson who along with the consultant shall have the power to convene the committee. The chairperson shall not be the principal of the building.

24. Each committee shall meet at times convenient to the majority of its members, including evenings and weekends. The School District shall provide a suitable room in the respective building for each committee meeting.

### B. Function

25. Each building committee shall review all discipline policies in effect in the building, shall propose necessary changes to the consultant and shall make recommendations to the consultant on any proposals presented by the consultant and on any matters set forth in paragraph 13.

26. Each building committee shall consult with and report the view of as many students, parents in the building as possible. To this end the committees may schedule workshops and meetings for students, parents, teachers and administrators. The School District shall provide facilities necessary for such meetings.

27. Each committee shall be supplied by the School District with the information set forth in paragraph 14 which pertains to the respective building.

## III. *GOALS*

28. The School District shall adopt the goal of eliminating the racial disparities in suspension rates by reducing the overall number of suspensions.

29. For the purposes of this section (III), suspension rates shall be calculated as set forth in paragraph 3(c) except that suspensions for physical assault on a teacher or student and possession of illegal drugs, alcohol or weapons on school property, shall not be included in calculating the suspension rates.

30. The elimination of the racial disparities in suspension rates by the reduction of the overall number of suspensions shall be accomplished according to the following timetable of goals:

a. *June 30, 1980*—at each school (NFA, NJH and SJH) the difference between the suspension rate of the minority student population and that of the white population shall be reduced to 0.20;

b. *January 31, 1981*—at each school (NFA, NJH and SJH) the difference between the suspension rate of the minority student population and that of the white population shall be reduced to 0.10;

c. *June 30, 1981*—at each school (NFA, NJH and SJH) the difference between the suspension rate of the minority student population and that of the white population shall be zero except a difference of ± 0.05 due to statistical random variation shall be acceptable.

31. The School District shall provide a written report to the plaintiffs and the Court on July 30, 1980 and July 30, 1981. The report shall set forth the suspension rates by race, and, if necessary, the reasons why the goals have not been met and the actions to be taken to insure the goals will be met. At that time, plaintiffs may request that the Court order defendants to take whatever other actions are necessary.

IV. *STAFF*

32. The Board shall take whatever steps are necessary to hire more minority teachers, including but not limited to those steps recommended by the consultant which are consistent with the District's collective bargaining agreement, New York State Law and Commissioner of Education's Regulations on certifications. To this end, the Board shall adopt a resolution that it will, when hiring staff, seek out individuals who have demonstrated ability to work with minority students, and in furtherance of this goal, affirmatively recruit minority staff who have demonstrated this ability.

33. The Board shall report to the building committees and plaintiffs by September 30 of each year: the total number of teach-

ers hired, those teachers hired preferentially according to the terms of the collective bargaining agreement with the Newburgh Teachers Association, the subject and grade level for which the teacher was hired, and the race of each teacher hired.

V. *COMPLIANCE WITH PRELIMINARY INJUNCTION* [4]

34. The School District will take all steps necessary to insure the terms of the preliminary injunction of this Court are being and will be complied with.

35. The School District shall not suspend members of the plaintiff class for periods in excess of five school days without:

(a) affording them the opportunity for a hearing at which the student may question any adverse witnesses whose statements and/or testimony is considered by the hearing examiner;

(b) preparing a verbatim record of such disciplinary hearings;

(c) notifying the student and his/her parents of the reason for the suspension, the date the offense occurred, and the particulars of the offense; and

(d) notifying the student and parents, prior to the hearing, of any written statements to be introduced into evidence at the hearing, including but not limited to, the principal's written request for the hearing.

36. The School District shall not suspend members of plaintiff class unless these students have been suspended by officials lawfully empowered to do so.

VI. *ATTORNEYS' FEES AND COSTS*

A. Fees and Costs Covered by Court's Order of July 27, 1979 [5]

37. The Court shall order the amount of fees to be paid in connection with plaintiffs'

---

4. On June 8, 1977, this Court (Cannella, J.) granted plaintiffs' motion for a preliminary injunction enjoining the School District from violating the requirements of New York Education Law § 3214(3). 500 F.Supp. 928, (S.D.N.Y. 1977). This provision establishes a procedure for the suspension of a school pupil.

5. On July 27, 1979, this Court granted plaintiffs' motion for interim attorney's fees for prevailing on their motion for a preliminary injunction (See n. 4, *supra* at 942).

prevailing on their motion for a preliminary injunction.[6]

### B. Fees and Costs Not Covered by the Court's Order [7]

38. The parties shall have 30 days to arrive at an amount of fees and costs to be paid by the School District to plaintiffs for fees and costs not covered by the Court's prior Order.

39. If an agreement is not reached within 30 days, the matter will be determined by the Court. Plaintiffs shall have 15 days to submit to the Court a statement of fees and costs and defendants shall have 7 days to submit any response.

### III. *Evaluation of the Settlement*

 The District Court exercises its equitable powers in determining whether or not to approve a Title VII civil rights class action settlement agreement. *Rios v. Enterprise Asso. Steamfitters Local*, 501 F.2d 622, 629 (2d Cir. 1974), *citing, United States v. Wood, Wire and Metal Lathers International Union*, 471 F.2d 408, 413 (2d Cir.), *cert. denied*, 412 U.S. 939, 93 S.Ct. 2773, 37 L.Ed.2d 398 (1973). The Court's role is to determine if the settlement is fair to the class and the parties, and an adequate and reasonable resolution of the dispute. *Patterson v. Newspaper and Mail Deliverers' Union*, 384 F.Supp. 585, 587 (S.D.N.Y.1974), *aff'd*, 514 F.2d 767 (2d Cir. 1975), *cert. denied*, 427 U.S. 911, 96 S.Ct. 3198, 49 L.Ed.2d 1203 (1976), *citing, West Virginia v. Chas. Pfizer & Co.*, 314 F.Supp. 710 (S.D.N.Y. 1970), *aff'd*, 440 F.2d 1079 (2d Cir.), *cert. denied*, 404 U.S. 871, 92 S.Ct. 81, 30 L.Ed.2d 115 (1971). If the proponents of the settlement prove (1) the settlement is not collusive but was reached after arm's length negotiations, (2) the proponents have counsel experienced in similar cases, (3) there has been sufficient discovery to enable counsel to act intelligently, and (4) the number of objectants or their relative interest is small, then the proponents have established a strong, initial presumption that the settlement is fair and reasonable. *Feder v. Harrington*, 58 F.R.D. 171, 174–75 (S.D.N.Y.1972); See, *Cotton v. Hinton*, 559 F.2d 1326, 1330 (5th Cir. 1977); *Young v. Katz*, 447 F.2d 431, 433 (5th Cir. 1971).

 This Court finds that the proponents of the settlement have established the four propositions stated above:

(1) negotiations between the parties took place at arm's length. The six year pre-litigation history shows that this action has been hotly contested; several motions have been vigorously litigated. The issues presented in this action have been difficult to settle, but the parties have presented an innovative approach reflecting their good faith efforts. Also, there has been no suggestion of collusion.

(2) counsel on both sides are respected members of the bar, and have sufficient experience to merit their involvement in this action. Plaintiffs' attorneys have submitted to the Court resumes of their experience in handling civil rights actions. Defendants' attorneys, during the settlement negotiations, were local counsel and cognizant of the needs and capabilities of the School District.

(3) compromise was reached after extensive discovery had been completed. The discovery period lasted several years, with the Court having twice granted extensions after hearings.

(4) the Court ordered notice of the proposed settlement to the class members. To date, there are no objections to the proposed settlement.

After finding that the settlement is fair to the class and an adequate and reasonable resolution of the dispute, the Court must still focus on the terms of the settlement and undertake an analysis of the law relevant to the proposed compromise. *Cotton v. Hinton, supra*, 559 F.2d at 1330; See *Protective Committee for Independent Stockholders of TMT Ferry, Inc. v. Anderson*, 390 U.S. 414, 424, 88 S.Ct. 1157, 1163, 20 L.Ed.2d 1 (1968); *Feder v. Harrington*,

---

6. See discussion at IV, p. 946.

7. See discussion at V, p. 948.

*supra*, 58 F.R.D. at 175. The Court's function, under this test, is to consider the strength of plaintiffs' case on the merits, balanced against the offered settlement. *Protective Committee for Independent Stockholders of TMT Ferry, Inc. v. Anderson, supra*, 390 U.S. at 424, 88 S.Ct. at 1163; *Armstrong v. Board of School Directors*, 471 F.Supp. 800, 804 (E.D.Wis.1979).

 In examining the terms of the settlement, there is a general framework within which this Court must operate. In a Title VII case, as here, there is a strong policy favoring settlement, particularly where voluntary compliance by the parties over an extended period of time will contribute significantly to the ultimate achievement of statutory goals. *Patterson v. Newspaper & Mail Deliverers' Union, supra*, 514 F.2d at 771; *United States v. Allegheny-Ludlum Industries, Inc.*, 517 F.2d 826 (5th Cir. 1975), *cert. denied*, 425 U.S. 944, 96 S.Ct. 1684, 48 L.Ed.2d 187 (1976); *Florida Trailer & Equipment Co. v. Deal*, 284 F.2d 567, 571 (5th Cir. 1960). There is also an overriding public interest in favor of settlement in class action suits. *Cotton v. Hinton, supra*, 559 F.2d at 1331, *citing, Van Bronkhorst v. Safeco Corp.*, 529 F.2d 943, 950 (9th Cir. 1976). Absent fraud, collusion, or the like, the Court should hesitate to substitute its judgment for that of the experienced counsel for the parties. *Cotton v. Hinton, supra*, 559 F.2d at 1330, *citing, Flinn v. FMC Corporation*, 528 F.2d 1169, 1173 (4th Cir. 1975), *cert. denied*, 424 U.S. 967, 96 S.Ct. 1462, 47 L.Ed.2d 734 (1976). Finally, the compromise of the parties is the heart of their settlement. "The trial court should not make a proponent of a proposed settlement 'justify each term of settlement against a hypothetical or speculative measure of what concessions might have been gained; inherent in compromise is a yielding of absolutes and an abandoning of highest hopes.' *Milstein v. Werner*, 57 F.R.D. 515, 524–25 (S.D.N.Y.1972)." *Cotton v. Hinton, supra*, 559 F.2d at 1330.

The general terms of the settlement are: (1) that committees on discipline shall be established at Newburgh Free Academy,

North and South Junior High Schools, composed of students, parents, community representatives, teachers and principals. Members of the committees are to be chosen by plaintiffs and the School District; (2) the School District will establish goals for the elimination of the alleged differences in suspension rates of minority and non-minority students; (3) the School District will provide consultants to work with the committees to develop plans for the achievement of the goals and to provide training on race relations and discipline for teachers and administrators; (4) notice and opportunity to be heard will be given before any student is suspended for more than five days; (5) the School Board will affirmatively recruit minority teachers.

The central claim of plaintiffs' case is that the disciplinary process, specifically, the suspension procedure used by the School District, discriminates against the minority students in the Newburgh school system. Plaintiffs have presented statistical and other evidence alleging that the School District, in the past, has violated the state procedure for suspending students established by § 3214 of the New York Education Law.

In an earlier decision by this Court (Cannella, J.), dated June 8, 1977, a motion by plaintiffs for a preliminary injunction against the School District, plaintiffs' claims concerning § 3214 of the Education Law were scrutinized and found to be valid. As the Court stated, "largely undisputed facts establish consistent violations of the following requirements of § 3214 of the New York Education Law: (1) that a student suspended in excess of five days be given the opportunity to question adverse witnesses; (2) that a verbatim record of the disciplinary hearing be kept; (3) that the suspended student and his or her parents be notified of the reasons for the suspension; (4) that the student and parents be notified, prior to the hearing, of written statements to be introduced into evidence at the hearing; and (5) that the student be suspended

only by a school official lawfully authorized to do so. The Court finds this to be a sufficient showing of probable success on the merits to warrant the granting of preliminary injunctive relief. See *Jacobson & Co. v. Armstrong Cork Co.*, 548 F.2d 438, 440–41 (2d Cir. 1977); *Triebwasser & Katz v. American Tel. & Tel. Co.*, 535 F.2d 1356, 1358 (2d Cir. 1976); *Sonesta Int'l Hotels Corp. v. Wellington Assocs.*, 483 F.2d 247, 250 (2d Cir. 1973)." *Ross v. Disare*, 500 F.Supp. 928 (S.D.N.Y.1977).

While the above-mentioned decision notes the probable success on the merits of plaintiffs' claims concerning suspensions of more than five days, the Court must now consider those suspensions of five days or less. This Circuit, in a recent opinion, has stated that a school suspension of five days or less offers few, if any, procedural safeguards for the disciplined student.

"Moreover, we cannot overlook the fact that the short duration of most sanctions imposed by school officials—e. g., a five-day suspension—insulates the entire process from effective review. *See Southeastern Promotions, Ltd. [v. Conrad]*, *supra*, 420 U.S. [546] at 562, 95 S.Ct. 1239 [43 L.Ed.2d 448]; *Freedman [v. Maryland]*, *supra*, 380 U.S. at [51] 57, 85 S.Ct. 734 [13 L.Ed.2d 649]. Where . . . the punishment is virtually terminated before judicial review can be obtained, many students will be content to suffer in silence, a silence that may stifle future expression as well. Further, although students must absorb considerable expense to challenge a suspension in court, school officials can mete out punishment without incurring the costs of procedural safeguards a conventional prosecution would require. *See Bantam Books, Inc. [v. Sullivan]*, *supra*, 372 U.S. [58] at 70, 83 S.Ct. 631 [9 L.Ed.2d 584]; Monagham, *supra*, at 543. Accordingly, students are not only less likely to challenge a punishment, but the state—in the person of school officials—can more easily 'prosecute' than if they proceeded through the judicial process. The chilling effect, therefore, is intensified because the promise of judicial review is virtually an empty one."

*Thomas v. Board of Education*, 607 F.2d 1043, 1052 (2d Cir. 1979), *cert. denied*, 444 U.S. 1081, 100 S.Ct. 1034, 62 L.Ed.2d 765 (1980). Plaintiffs have presented statistics lending credence to the possibility that minority students attending Newburgh schools suffer from the lack of procedural safeguards in five day or less suspensions pointed out in *Thomas, supra*.[8] Such suspension policy is cause for concern since the School District has been enjoined from violating the state procedure for suspensions of more than five days.

The settlement addresses suspensions for more than and for less than five days and proposes, through the use of consultants and committees composed of students, parents, community representatives, teachers and principals, to develop, establish and in-

8. "the plaintiffs have submitted statistics prepared by the school system itself in compliance with Title VI of the 1964 Civil Rights Act and Title IX of the 1972 Educational Amendments. Plaintiffs have culled the following from these statistics:

1. The percentage of minority enrollment and suspensions at North Junior High, South Junior High and Newburgh Free Academy . . . are as follows ('minority' includes Black and Spanish surnamed students):

1973–74

| | Per Cent Minority Enrollment | Per Cent Minority Suspensions |
|---|---|---|
| North Jr. High | 32.5% | 83.5% |
| South Jr. High | 35.4% | 54.9% |
| Newburgh Free Academy (High School) | 26.2% | 39.0% |

| | Per Cent Minority Enrollment | Per Cent Minority Suspensions |
|---|---|---|
| Newburgh City School District | 31.9% | 51.2% |

2. The rates of suspensions relative to the number of minority and white students at these schools in 1973–1974 was as follows:

| | Non-white | White |
|---|---|---|
| North Jr. High | 20.4% | 1.9% |
| South Jr. High | 16.1% | 7.3% |
| Newburgh Free Academy | 37.2% | 18.6% |
| Newburgh City School District | 11.9% | 5.3%" |

*Ross v. Klotz* (S.D.N.Y.1976).

stitute plans to eliminate the alleged differences in suspension policies between minority and non-minority students, and at the same time provide training on race relations and discipline for teachers and administrators. The imposition of goals to eliminate racial disparities in suspension rates by the reduction of the overall number of suspensions according to the timetable set forth in paragraph 30 of the proposed Consent Decree[9] does not violate the due process and equal protection clauses of the Constitution. See *Rios v. Enterprise Asso. Steamfitters Local, supra,* 501 F.2d at 628–31. In fact, as a safeguard, paragraph 31 of the Consent Decree requires the School District to provide written status reports to this Court on the implementation of these goals.[10] Finally, successful efforts to affirmatively recruit more minority teachers would broaden inter-racial participation at all levels and further a successful implementation of the proposed settlement.

■ The proposed settlement incorporates most of the relief requested by plaintiffs in their complaint. In addition, the establishment of committees with representatives from all parties concerned, and the hiring of impartial consultants, affords the parties the possibility of including additional programs, remedies and goals not foreseen at the time of the Consent Decree. Further litigation in this action would be timely and expensive. Accordingly, this Court considers the proposed settlement fair and reasonable: (1) in view of the foregoing discussion; (2) in light of all the risks inherent in litigation and potential time consuming appeals; (3) the fact there are no objectants; and (4) particularly since immediate implementation of the terms of the Consent Decree provides for plaintiffs' requested relief while at the same time allowing for improvement.

## IV. Attorneys' Fees and Expenses for the June 8, 1977 Preliminary Injunction.

On June 8, 1977, this Court (Cannella, J.) granted plaintiffs' motion for a preliminary injunction enjoining defendants from violating the requirements of § 3214 of the New York Education Law. Defendants appealed the Order and the Second Circuit Court of Appeals affirmed.[11] Plaintiffs sought an award of interim attorneys' fees for securing the preliminary injunction and successfully defending it on appeal. On July 27, 1979, this Court granted plaintiffs' request for attorneys' fees and directed plaintiffs to submit to the Court a statement of attorneys' time and expenses, and supporting affidavits for a determination of reasonable fees.

On September 19, 1979, plaintiffs filed their statement of attorneys' fees and costs, requesting a total of $51,293.75.[12] Defendants filed on November 16, 1979, papers opposing plaintiffs' computation of attorneys' time and expenses. Defendants allege (1) that there must be an evidentiary hearing in order to accurately determine the extent and nature of the attorneys' services rendered by plaintiffs' counsel in connection with the issuance of the preliminary injunction, and (2) that attorneys' fees sought by plaintiffs should be substantially reduced as a result of alleged "duplicity of attorneys' services, unnecessary expenditures of time and expenditures of time unconnected with the issuance of the preliminary injunction and overcharging for administrative services rendered (e. g., telephone calls, conferences, filing papers, etc.)."[13] On December 3, 1979, plaintiffs

---

9. See Appendix A, *infra.*

10. *Ibid.*

11. Affirmed in open court on August 15, 1977.

12. Plaintiffs have been represented by both the "Children's Defense Fund" and the "Mid-Hudson Valley Legal Services." Of the total amount requested, $29,795. is allocated to the "Children's Defense Fund", and the remaining $21,498.75 is allocated to the "Mid-Hudson Valley Legal Services."

13. Defendants' Memorandum In Opposition to Plaintiffs' Statement of Attorneys' Time and Expenses at 1–2.

filed a reply memorandum and declaration in support of plaintiffs' statement of attorneys' fees. Plaintiffs included in their reply papers an amended statement of attorneys' fees which set forth additional time spent since the filing of plaintiffs' first statement. The amended statement increased the total amount requested by plaintiffs' counsel to $58,133.75.[14]

■ In reviewing plaintiffs' application for an award of attorneys' fees pursuant to 42 U.S.C. § 1988, the Court examines the following factors: (1) the time and labor required; (2) the novelty and difficulty of the questions; (3) the skill requisite to perform the legal services properly; (4) the preclusion of other employment by the attorneys due to acceptance of the case; (5) the customary fee for similar work in the community; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or other circumstances; (8) the amount of damages involved and the results obtained; (9) the experience, reputation and ability of the attorneys; (10) the undesirability of the case; (11) the nature and length of the professional relationship with the client. *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714, 717–19 (5th Cir. 1974); see also *Torres v. Sachs*, 538 F.2d 10 (2d Cir. 1976).

Plaintiffs' attorneys have drafted their statements of time and expenses, and supporting affidavits, in accordance with these standards. An examination of these factors show: (1) the supporting affidavits detail the hours and labor spent by each attorney and the specific tasks performed by each. In addition, the affidavits allege that there was no unnecessary duplication of efforts and only work necessary to the preliminary injunction was included; (2) the novelty and difficulty of the questions in plaintiffs' case are discussed earlier in this opinion

under the evaluation of the settlement; (3) plaintiffs' counsel was presented with vigorous opposition and litigation by defendants. The high competence of plaintiffs' counsel was reflected in their work product, preparation and overall handling of the case; (4) plaintiffs' counsel spent many long hours and days concentrating exclusively on plaintiffs' case; (5) the affidavits set forth the hourly billing rates which have been established according to the customary fees in the Southern District and Washington, D. C.[15] for attorneys with equivalent years of experience. These rates are in accord with rates previously recognized by this Court for public interest and legal services organizations. *Mid-Hudson Legal Services v. G & U, Inc.*, 465 F.Supp. 261, 272 (S.D.N.Y.1978). For work performed in 1979, the rates have been increased to reflect inflation and the increase in customary fees in New York and Washington, D. C.; (6) the amount requested has been determined by the number of hours spent and expenses incurred in connection with the granting of the preliminary injunction; (7) although the parties have agreed to a settlement, plaintiffs' counsel was required to litigate in the District Court and on appeal the preliminary injunction enjoining defendants from further violating § 3214 of the New York Education Law. These circumstances presented plaintiffs' counsel with many time limitations; (8) the relief obtained was the granting and affirmance of the preliminary injunction. The recovery of monetary damages was not an issue; (9) the experience, reputation and ability of plaintiffs' attorneys are discussed earlier in this opinion under the evaluation of the settlement; (10) "Civil rights attorneys face hardships in their communities because of their desire to help the civil rights litigant [citations omitted]. Oftentimes his decision to help eradicate discrimination is not pleas-

---

14. Under plaintiffs' amended statement of attorneys' time and expenses, $31,635. is allocated to the "Children's Defense Fund", and $26,498.75 is allocated to the "Mid-Hudson Valley Legal Services."

15. The offices of the "Children's Defense Fund" are located in Washington, D. C.

antly received by the community or his contemporaries. This can have an economic impact on his practice which can be considered by the Court." *Johnson v. Georgia Highway Express, Inc., supra,* 488 F.2d at 719. Plaintiffs' attorneys are public interest lawyers who, in this case, faced many of the same hardships pointed out in *Johnson, supra;* (11) plaintiffs' counsel have had a close professional relationship with plaintiffs and the class members these past six years. This relationship most likely will continue while the terms of the settlement are implemented.

■ Defendants, in their opposing papers, dispute many of the facts and figures set forth in the affidavits and statements of time and expenses submitted by plaintiffs' attorneys. Defendants request an evidentiary hearing [16] in order to accurately compute the amount of attorneys' fees to be awarded plaintiffs' counsel. Since this Court must still review the parties' settlement, if any, of the attorneys' fees and costs not covered by the Court's July 27, 1979 Order,[17] for judicial economy an evidentiary hearing will be scheduled (1) to consider the extent and nature of the attorneys' services rendered by plaintiffs' counsel in connection with the issuance of the preliminary injunction, as set forth in plaintiffs' statements of attorneys' time and expenses and supporting affidavits, and defendants' objections thereto as set forth in defendants' affidavit and memorandum in opposition to plaintiffs' statement of attorneys' time and expenses, and (2) to consider the amount of fees and costs to be paid by the School District to plaintiffs for fees and expenses not covered by the Court's July 27, 1979 Order.

## V. Attorneys' Fees and Expenses Not Covered in IV.

For the reasons stated in IV, an evidentiary hearing will be scheduled to determine the fees and expenses not covered by the July 27, 1979 Order granting plaintiffs interim attorneys' fees. Plaintiffs shall submit to this Court a statement of time and expenses, and supporting papers, for these additional fees no later than forty five (45) days after entry of this Order. If no settlement with respect to these fees is reached by the parties, defendants shall submit opposing papers no later than seven (7) days after service upon them of plaintiffs' application; plaintiffs may submit reply papers no later than seven (7) days after receipt of defendants' objections. The Court will then schedule a hearing date.

It Is So Ordered.

## VI. Appendix

Appendix A is the complete text of the Consent Decree between the parties.

---

**16.** Plaintiffs argue in their reply papers that the Court is not required to hold an evidentiary hearing on the amount of fees due to plaintiffs, and that such a hearing would unnecessarily prejudice plaintiffs. However, the Court has discretion to hold an evidentiary hearing in the absence of explicit requirements. *U.S. Fidelity and Guaranty Co. v. Lawrenson,* 334 F.2d 464, 466–67 (4th Cir.), *cert. denied,* 379 U.S. 869, 85 S.Ct. 141, 13 L.Ed.2d 71 (1964); *World Brilliance Corp. v. Bethlehem Steel Co.,* 342 F.2d 362, 366 (2d Cir. 1965). There is authority to suggest that such an evidentiary hearing, even if not required, is strongly encouraged, particu-larly where there is evidence of factual disputes. See *City of Detroit v. Grinnell Corp.,* 495 F.2d 448, 473–74 (2d Cir. 1974); *Lindy Bros. Builders, Inc. v. American Radiator and Standard Sanitary Corp.,* 487 F.2d 161, 169 (3d Cir. 1973); *Perkins v. Standard Oil Co.,* 399 U.S. 222, 223, 90 S.Ct. 1989, 1990, 26 L.Ed.2d 534 (1970); Rule 11B of the Civil Rules of the United States District Courts for the Southern and Eastern Districts of New York.

**17.** *City of Detroit v. Grinnell Corp., supra,* 495 F.2d at 470–71; See also paragraphs 38 and 39 of the Consent Decree at Appendix A, *infra.*

## APPENDIX A

### UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK

PAULETTE ROSS, et al.,
 Plaintiffs

 v.

DONALD W. SALTMARSH, et al.,
 Defendants

74 Civ. 5047 (MJL)

### CONSENT DECREE

This class action was filed on November 15, 1974 on behalf of all minority students in the School District of Newburgh, New York. The case challenges the racially discriminatory administration of discipline, the failure to provide adequate notice and an opportunity to be heard prior to suspension from school, and the failure to provide equal educational opportunities to minority students.

The policies and practices of the School District are challenged as violating the rights of plaintiffs and the members of the class they represent under Title VI of the Civil Rights Act of 1964 (42 U.S.C. §§ 2000d et seq.), the due process and equal protection clauses of the Fourteenth Amendment of the United States Constitution, New York Education Law § 3214, and the Equal Educational Opportunities Act of 1974 (20 U.S.C. §§ 1701, et seq.).

Defendants, hereinafter "the School District", are the Board of Education of the City School District of Newburgh, the Board's members, the Superintendent of Schools, the principal and vice principal of North Junior High School. All of the defendants are sued in their official capacities.

Plaintiffs are minority students and their parents. On March 19, 1976 this action was certified as a class action with plaintiffs representing the class of all non-white students attending schools in the Newburgh City School District.

On June 8, 1977, the Court granted plaintiffs' motion for a preliminary injunction and enjoined the defendants from suspending students without providing specified procedural safeguards.

Following a period of negotiations, plaintiffs and the School District have agreed to the entry of this Consent Decree which settles all claims against the School District except for the claim of attorneys' fees. Agreement to the entry of this Decree does not constitute an admission by any party as to any issue of fact or law regarding discrimination by and/or liability of the School District, nor does it constitute a waiver of plaintiffs' claim for attorneys' fees against the School District, nor any defenses the School District may have against that claim.

It is therefore, ORDERED, ADJUDGED AND DECREED:

1. This Court has jurisdiction over the subject matter of all of plaintiffs' claims against the School District and jurisdiction over the persons of the defendants with respect to these claims.

2. Pursuant to Rule 23(c)(3) of the Federal Rules of Civil Procedure, the class to which this decree applies is defined as: all minority students attending schools in the Newburgh City School District.

3. For the purposes of this Decree the following definitions shall apply unless a contrary meaning is indicated in the text:

(a) "suspension" shall mean exclusion from school and/or regular classroom attendance including participation in in-

school suspension programs such as Project Rescue;

(b) "minority" shall mean a member of the black and/or Hispanic race;

(c) "suspension rate" shall mean the ratio of the number of students suspended at least once to the number of students in the relevant school population;

(d) "disparities" shall mean difference; the mention of the word disparities in no way constitutes an admission by the defendants that such disparities exist.

(e) "entry of this Decree" shall mean the signing of this Decree by the Court.

## I. CONSULTANTS

### A. Selection and Contract

4. The District shall contract with an individual or group, hereinafter the "consultant" which shall assist in meeting the goals and carrying out the provisions of this Consent Decree.

5. The plaintiffs shall nominate candidates to act as consultants. Such candidates shall have as minimum qualifications a Bachelor's Degree and a background in both education and human relations. No candidate may reside within the district. The School District shall select one of the nominees unless they can show good cause for rejection of all plaintiffs' nominees. In such case, plaintiffs shall make additional nominations. The School District shall have the option to contract with the consultant on a full time or part time basis. The terms of the contract shall be in accord with the provisions of this Decree and shall be approved by both parties. The terms of the contract with the consultant shall be until June 30, 1981 unless the "Goals" set forth in paragraph 30 are met sooner. In the event the timetable, set forth in paragraph 30, is not met and a new timetable is set, the term shall be extended in accordance with the new timetable.

5a. The School District shall have the right to recommend candidates to the plaintiff for the position of consultant.

6. The consultant shall be selected and the contract approved by both parties within 45 days of the entry of this Decree.

7. If the School District or the plaintiffs find that the consultant is not complying with the terms of this Decree, the parties shall meet to resolve the situation and may choose another consultant.

### B. Function

8. The consultant shall advise the defendants of and develop written plans for all steps necessary to the elimination of the racial disparities in suspension rates at Newburgh Free Academy, North Junior High School and South Junior High School.

9. The consultant shall meet with students, parents, teachers, administrators, Board of Education members, and attorneys for both parties in order to assess what is necessary for the elimination of the racial disparities in suspension rates. The consultant shall continue to consult with the above-named individuals during the course of the contract.

10. The consultant shall work with each building committee, established pursuant to this Decree, to identify policies and practices which account for disparities in suspension rates for minority students.

11. The consultant shall develop proposals for the elimination of the racial disparities in suspension rates and shall:

a. present those proposals in writing to the building committees established by this Decree;

b. work with the committees to insure the proposals meet the needs of the respective schools;

c. modify the proposals if appropriate in view of the advice of the committee;

d. present the proposals in writing to the superintendent of the School District for approval.

12. If the Superintendent rejects or modifies the proposal, or fails to act on it within 7 days of submission to him, the consultant and/or building committees may present the proposal to the Board of Education for its approval or rejection.

13. The consultant's written proposals for the elimination of the racial disparities

in suspension rates shall include but not be limited to:

a. Modifications of the "Right to Learn", the School District's student behavior code, including the simplification and clarification of its provisions to make it more easily understood by students and parents and the reduction of the use of suspensions and other methods of discipline which remove students from the classroom;

b. Design of in-school alternatives to suspension including modifications in Project Rescue;

c. Involvement of students in peer discipline such as through a student team system and/or student monitors;

d. Greater involvement of guidance counselors in the discipline process;

e. Greater involvement of parents and student advocates in the discipline process;

f. Assistance to teachers for classes with large numbers of discipline referrals;

g. Tutoring arrangements for students with achievement related behavior problems;

h. Referral of students to psychological services;

i. Encouragement and facilitation of interracial participation in all student extracurricular activities;

j. The possibility of alternatives to methods of academic grouping that lead to classrooms with racial homogenous student populations or classrooms with predominant minority populations.

14. At the time performance of the contract begins and thereafter the school district shall supply the consultant with all statistical and other information available to it which deals with discipline, including:

(a) all written policies presently in effect;

(b) access to all student guidance files; as allowed by the Court in its order of September 7, 1977 and this Decree;

(c) current summaries of suspensions and those which have been prepared in the past five years by the Superintendent's Office;

(d) current suspension logs and those which have been prepared in the past five years by principals of the schools;

(e) any other information necessary to the function of the consultant.

15. Plaintiffs, through their attorneys, shall furnish to the consultant all statistical information they have compiled in the course of discovery in this action.

16. At the conclusion of each school semester the school district shall furnish to the consultant:

a. a suspension log showing for each suspension by a principal or the Superintendent: name of the student, race, grade, referring teacher, offense, date of suspension, suspending official, date of return to school and length of suspension;

b. for each referral to Project Rescue or other in-school suspension programs; the name of the student, race, grade, referring teacher, reason for referral, school.

c. for each teacher the number of disciplinary referrals of students to an administrator by race of the referred students.

17. The consultant shall arrange for the school district to contract for training in race relations and in strategies for handling discipline problems for all teachers and administrators. He/she shall arrange for such training by a group and on terms mutually agreeable to the school district and plaintiffs. Such training shall commence within 45 days of the signing of the contract between the school district and the consultant.

18. The consultant shall arrange for the school district to contract for the training of parents and students who participate on the building committees in order to enable them to participate effectively. He/she shall choose a group to do the training subject to the approval of the Board of Education. Such training shall commence within 45 days of the signing of the con-

tract between the school district and the consultant.

19. The consultant shall prepare written reports at the end of each school semester for both the school district and the plaintiffs on the progress in meeting the goals set forth in this Decree. Such reports shall include the following;

 a. the suspension logs prepared by the building principals, the other information furnished for that semester as set forth in paragraph 14 above;

 b. the steps taken thus far to eliminate the racial disparities in suspension rates;

 c. the immediate steps that need to be taken;

 d. copies of all proposals presented during that semester to the building committees, the Superintendent, and/or the Board;

 e. all policies adopted by the Board and/or the Superintendent during the semester.

II. *COMMITTEES*

A. Formation

20. A committee on discipline shall be established for each building: Newburgh Free Academy (NFA), North Junior High School (NJH) and South Junior High School (SJH).

21. Each Building Committee shall be composed of: one (1) teacher, four (4) students, four (4) parents of students within the particular building, one (1) community representative, and the principal of the building. Three (3) students, three (3) parents and the community representative shall be chosen by the plaintiffs. One (1) student, one (1) parent and one (1) teacher shall be chosen by the school district. A representative of the Superintendent may attend the meetings as a non-voting participant.

22. The committee shall be convened within 20 days of the entry of this Decree by the principal of the building.

23. At its first meeting each committee shall elect a chairperson who along with the consultant shall have the power to convene the committee. The chairperson shall not be the principal of the building.

24. Each committee shall meet at times convenient to the majority of its members, including evenings and weekends. The school district shall provide a suitable room in the respective building for each committee meeting.

B. Function

25. Each building committee shall review all discipline policies in effect in the building, shall propose necessary changes in such to the consultant and shall make recommendations to the consultant on any proposals presented by the consultant and on any matters set forth in paragraph 13.

26. Each building committee shall consult with and report the view of as many students, parents in the building as possible. To this end the committees may schedule workshops and meetings for students, parents, teachers and administrators. The school district shall provide facilities necessary for such meetings.

27. Each committee shall be supplied by the school district with the information set forth in paragraph 14 which pertains to the respective building.

III. *GOALS*

28. The school district shall adopt the goal of eliminating the racial disparities in suspension rates by reducing the overall number of suspensions.

29. For the purposes of this section (III), suspension rates shall be calculated as set forth in paragraph 3(c) except that suspensions for physical assault on a teacher or student and possession of illegal drugs, alcohol or weapons on school property, shall not be included in calculating the suspension rates.

30. The elimination of the racial disparities in suspension rates by the reduction of the overall number of suspensions shall be accomplished according to the following timetable of goals:

 a. *June 30, 1980*—at each school (NFA, NJH and SJH) the difference between the suspension rate of the minority student population and that of

the white population shall be reduced to 0.20;

b. *January 31, 1981* —at each school (NFA, NJH and SJH) the difference between the suspension rate of the minority student population and that of the white population shall be reduced to 0.10;

c. *June 30, 1981* —at each school (NFA, NJH and SJH) the difference between the suspension rate of the minority student population and that of the white population shall be zero except a difference of ± 0.05 due to statistical random variation shall be acceptable.

31. The school district shall provide a written report to the plaintiffs and the Court on July 30, 1980 and July 30, 1981, shall set forth the suspension rates by race, and, if necessary, the reasons why the goals have not been met and the actions to be taken to insure the goals will be met. At that time, plaintiffs may request that the Court order defendants to take whatever other actions are necessary.

IV. *STAFF*

32. The Board shall take whatever steps are necessary to hire more minority teachers, including but not limited to those steps recommended by the consultant which are consistent with the district's collective bargaining agreement, New York State Law and Commissioner of Education's Regulations on certifications. To this end, the Board shall adopt a resolution that it will, when hiring staff, seek out individuals who have demonstrated ability to work with minority students, and in furtherance of this goal, affirmatively recruit minority staff who have demonstrated this ability.

33. The Board shall report to the building committees and plaintiffs by September 30 of each year; the total number of teachers hired, those teachers hired preferentially according to the terms of the collective bargaining agreement with the Newburgh Teachers Association, the subject and grade level for which the teacher was hired, and the race of each teacher hired.

V. *COMPLIANCE WITH PRELIMINARY INJUNCTION*

34. The School District will take all steps necessary to insure the terms of the preliminary injunction of this Court are being and will be complied with.

35. The School District shall not suspend members of the plaintiff class for periods in excess of five school days without:

a) affording them the opportunity for a hearing at which the student may question any adverse witnesses whose statement and/or testimony is considered by the hearing examiner;

b) preparing a verbatim record of such disciplinary hearings;

c) notifying the student and his/her parents of the reason for the suspension, the date the offense occurred, and the particulars of the offense; and

d) notifying the student and parents, prior to the hearing, of any written statements to be introduced into evidence at the hearing, including but not limited to, the principal's written request for the hearing.

36. The School District shall not suspend members of plaintiff class unless these students have been suspended by officials lawfully empowered to do so.

VI. *ATTORNEYS' FEES AND COSTS*

A. Fees and Costs Covered by Court's Order of July 27, 1979

37. The Court shall order the amount of fees to be paid in connection with plaintiffs' prevailing on their motion for a preliminary injunction.

B. Fees and Costs Not Covered by the Court's Order

38. The parties shall have 30 days to arrive at an amount of fees and costs to be paid by the School District to plaintiffs for fees and costs not covered by the Court's prior Order.

39. If an agreement is not reached within 30 days, the matter will be determined by the Court. Plaintiffs shall have 15 days to submit to the Court a statement of fees and costs and defendants shall have 7 days to submit any response.

**VII.** *NOTICE TO THE CLASS*

40. Within ten days of the entry of this Decree, the School District shall give notice of this Decree to the class represented by plaintiffs.

41. The form of the notice required by paragraph 40 shall be as set forth in Exhibit "A" to this Decree. The notice shall afford members of the class an opportunity to file objections to this Decree with the Clerk of this Court within fifteen days following the date of the initial publication of the notice. If there are any objections, there shall be a hearing by the Court on this matter at 10:00 A.M. on November 19, 1979. Otherwise, this Decree shall become final without any further action by this Court.

42. A copy of the notice shall be distributed at NFA, NJH and SJH to each class member five (5) days after the entry of this decree. It shall be published in a prominent position as a display advertisement in regular newspaper type size at least three times in the Newburgh Evening News.

**VIII.** *NOTICE TO PARTIES*

43. Any notice report or communication required by this Consent Decree or made pursuant to this Consent shall be sent by first class mail, postage prepaid, as follows:

*To Plaintiffs*

Carol R. Golubock, Esq.
1520 New Hampshire Avenue, N.W.
Washington, D.C. 20036

*To Defendants*

Leonard J. McCue, Esq.
771 Broadway
P.O. Box 2266
Newburgh, New York 12550

44. Either party may change the above designated addressee or address by notice to the other party. A copy of the notice shall be filed with the Clerk of this Court.

**IX.** *JURISDICTION*

45. The terms and conditions of this Decree shall be binding upon each of the defendant officials, their agents, employees and representatives, and upon their successors in office without the necessity for formal substitution.

45. The court retains jurisdiction of this action for purposes of granting any further relief or other appropriate orders as set forth in this Decree.

SO ORDERED, this, the 14 day of May, 1980.

APPROVED:

/s/ Mary Johnson Lowe
United States District Court Judge

/s/ Carol R. Golubock

CAROL R. GOLUBOCK, ESQ.

LAURA ZEISEL
Mid-Hudson Legal Services
P.O. Box 3783
Kingston, New York 12540
(914) 561–7040

WAYNE RUBIN
Mid-Hudson Legal Services
185 Liberty Street
Newburgh, New York 12550
(914) 561–7040

CAROL R. GOLUBOCK
DANIEL YOHALEM
CLARENCE A. DANIELS, JR.
MARIAN WRIGHT EDELMAN
Children's Defense Fund
1520 New Hampshire Avenue, N.W.
Washington, D.C. 20036
(202) 483–1470

Attorney for Plaintiffs

/s/ Leonard J. McCue

LEONARD J. McCUE, ESQ.

LEONARD J. McCUE, ESQ.
McCue & McCue
771 Broadway
P.O. Box 2266
Newburgh, New York 12550
(914) 565–5900

Attorney for Defendants

EXHIBIT A

## NOTICE TO MINORITY STUDENTS AND THEIR PARENTS OF PROPOSED SETTLEMENT OF DISCIPLINE CASE

This is to notify you that plaintiffs in the discipline lawsuit and the Newburgh School District propose to settle the lawsuit. The discipline lawsuit, *Ross, et al. v. Saltmarsh, et al.*, 74 Civ. 5047 (MJL) was brought on behalf of all minority students in the Newburgh schools and their parents. The case challenges the alleged racially discriminatory administration of discipline, the alleged failure to provide adequate notice and an opportunity to be heard prior to suspension from school, and the alleged failure to provide equal educational opportunities to minority students.

Copies of the settlement are available at the offices of the Newburgh Free Academy (NFA), North Junior High School (NJH), South Junior High School (SJH) and the Newburgh Board of Education. The general terms of the settlement are:

1) Building committees on discipline shall be established at NFA, NJH and SJH composed of students, parents, community representatives, teachers and principals. Members of the committees are to be chosen by the plaintiffs and the School District.

2) The School District will establish goals for the elimination of the alleged differences in suspension rates of minority and non-minority students.

3) The School District will provide consultant(s) to work with the committees to develop plans for the achievement of the goals and to provide training on race relations and discipline for teachers and administrators.

4) Notice and an opportunity to be heard will be given before any student is suspended for more than five days.

NOTICE IS HEREBY GIVEN that a hearing will be held before the Court on November 19, 1979 at 10:00 A.M. at the Federal Courthouse, Foley Square, New York City. The purpose of the hearing will be to determine whether the court should approve the settlement.

At the hearing any member of the class (any minority student now attending a Newburgh school or his/her parent) may appear and present any proper statement or evidence. No person who is not a class member will be heard and no person will be heard unless notice of intent to appear and copies of any statements or evidence to be presented are sent to the Clerk, United States District Court for the Southern District of New York, Room 803, Foley Square, New York, New York 10017, on or before November 15, 1979.

BE IT RESOLVED, the City School District of the City of Newburgh does hereby adopt and agree to the terms and conditions as set forth in the proposed Consent Decree, (consisting of fourteen (14) pages plus one (1) exhibit) annexed hereto in the suit presently pending in the United States District Court for the Southern District of New York, titled *Paulette Ross, et al., Plaintiffs, against Donald W. Saltmarsh, et al., Defendants.*

BE IT RESOLVED, the City School District of the City of Newburgh does hereby authorize and direct its General Counsel, Leonard J. McCue, Esq. to appear in the United States District Court for the Southern District of New York, in the Matter of *Paulette Ross, et als., against Donald W. Saltmarsh, et als.,* for the purpose of agreeing to the entry of the attached proposed Consent Decree, and the said General Counsel is further authorized and directed to sign such documents as are necessary, including said proposed consent decree, to effectuate the entry thereof.

I, JEANETTE RUBNITZ the duly appointed clerk of the Board of Education of the City School District of the City of New-

burgh do hereby certify that at a duly called special meeting of the Board of Education, notice of which meeting was given to each member thereof, held the 18th day of October, 1979, at which meeting a quorum of said Board being present, the above resolutions were duly proposed, seconded, and passed by an affirmative vote of the total membership of said Board.

/s/ Jeanette Rubnitz